**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CAROLINA DOOR CONTROLS, INC.,**

       **Plaintiff,**

**vs.**                                     **Case No.: 8:07-CV-269-T-24EAJ**

**PAUL ANDERTON and**
**ORANGE STATE DOOR**
**CONTROL, INC.,**

       **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Before the court are Plaintiff's **Emergency Motion for Preliminary Injunction and Incorporated Memorandum of Law** (Dkt. 2) filed on February 12, 2007, Defendants' **Response in Opposition** (Dkt. 12) filed on February 20, 2007, Plaintiff's **Motion for Expedited Discovery** (Dkt. 10) filed on February 16, 2007, and Defendants' **Memorandum in Opposition** (Dkt. 13) filed on February 20, 2007.[1]  The undersigned held a preliminary injunction hearing on February 22, 2007, and heard the parties' closing arguments on February 23, 2007.

After considering the testimony and the exhibits admitted at the hearing, the undersigned recommends that preliminary injunctive relief be granted, as detailed below, and that Plaintiff's motion for expedited discovery be denied as moot.

## I.    Background and Procedural History

Defendant Paul Anderton ("Anderton") is a former employee of Plaintiff Carolina Door Controls, Inc. ("Plaintiff" or "Carolina Door") who now works for Defendant Orange State Door

---

[1] The District Judge referred the matter to the undersigned for a report and recommendation (Dkt. 4).  See 28 U.S.C. § 636; Local Rules 6.01(b) and 6.01(c), M.D. Fla.

Control, Inc. ("Orange State").  On February 12, 2007, Carolina Door filed the instant motion for preliminary injunctive relief and requested that this court enforce a non-compete agreement between Carolina Door and Anderton and enjoin Anderton from (1) continuing his employment with Orange State, (2) soliciting Carolina Door's customers, and (3) doing business with Carolina Door's competitors for one year following the end of Anderton's employment with Carolina Door (Dkt. 2). Carolina Door also requests that the court enjoin Anderton and Orange State from misappropriating Carolina Door's trade secrets, and Carolina Door seeks the return of its proprietary and confidential information (Id. at 15).

Plaintiff's lawsuit filed simultaneously with the motion for preliminary injunction asserts the following claims: breach of contract against Anderton; violations of the Uniform Trade Secrets Act against Anderton and Orange State; and tortious interference with a business relationship against Anderton and Orange State (Dkt. 1).[2]

On February 16, 2007, Plaintiff also filed a Motion for Expedited Discovery, asking the court to order Defendants to produce certain documents prior to the evidentiary hearing on February 22, 2007 (Dkt. 10).  Defendants opposed this motion (Dkt. 13).

The court held an evidentiary hearing on the motion for preliminary injunction on February 22, 2007.  Plaintiffs submitted evidence at the hearing and relied on the testimony of Jim Engelerdt (Plaintiff's regional manager for the Southeast), Patricia Pratt (former office manager of Plaintiff's Tampa office), Randy Newton and Mike Littlefield (Plaintiff's employees), Richard Geise (owner of Orange State), and Anderton.  Defendants submitted evidence and called Engelerdt, Giese, and

---

[2] At the preliminary injunction hearing, however, Plaintiff did not assert an argument as to relief sought on the tortious interference claim.

Anderton to testify at the hearing.

The court heard the parties' closing arguments on February 23, 2007.  Before closing arguments, the parties filed notices of supplemental authority (Dkts. 16, 20).

## II.   Findings of Fact

1.  Plaintiff installs, repairs, and maintains automatic doors (Dkt. 2 at 2).[3]  Anderton is Plaintiff's former employee who began working in Plaintiff's Tampa office as a sales representative on May 3, 2004 (Id.; Pl. Ex. 13, 14).  This was Anderton's first time working in the automatic door industry; previously he sold electronics for twenty years.  Carolina Door promoted Anderton to the position of branch manager of its Tampa office on June 25, 2004 (Dkt. 14; Pl. Ex. 15).

2.  As branch manager Anderton was responsible for sales in Tampa and in areas within approximately a 100-mile radius of Tampa.  Anderton's duties included maintaining existing accounts and soliciting new ones.  Upon promotion, Anderton received a pay raise from $45,000 to $52,000 per year, plus bonuses and commissions (Pl. Ex. 14, 15).

3. Anderton had access to customer lists for the Tampa branch (including customers' names, addresses, and volume for sales to each customer), Plaintiff's pricing information, information regarding the profits and losses of the Tampa branch, and service request forms (Dkt. 2 at 6). Carolina Door considers this information confidential and does not grant all of its employees access to this information.

4.  In February 2005, Carolina Door was acquired by and became a subsidiary of DORMA, a nationwide manufacturer and supplier of door technology products and systems (Dkt. 1 at 1). Shortly thereafter, on March 9, 2005, Anderton signed a Non-Compete, Non-Solicitation and Non-

---

[3]  Plaintiff's Tampa branch apparently also does business as "Aldoors of Florida".

Disclosure Agreement with Plaintiff ("the Agreement", Pl. Ex. 2).  Anderton had not been asked to sign a non-compete agreement prior to this.[4]  Also on March 9, 2005, Anderton signed a letter of understanding regarding his continued employment with Carolina Doors and DORMA (Pl. Ex. 16).  The Agreement included a guarantee of $75,000 for calendar year 2005, plus any bonuses Anderton earned throughout the year (Pl. Ex. 2 at ¶ 4a).  Carolina Doors paid Anderton $100 for signing the letter of understanding and agreed to a $4,000 bonus payable to Anderton on January 6, 2006, provided Anderton met his sales quota (Pl. Ex. 2 at ¶¶ 3, 4c; Pl. Ex. 16 at 1).  There is no evidence that he did not receive the bonus.

5.   North Carolina law governs the Agreement pursuant to a choice of law provision (Pl. Ex. 2 at ¶ 9e).[5]  Among other things, the Agreement prohibits Anderton from disclosing Plaintiff's proprietary information (Id. at ¶ 2).  This provision applies for one year following Anderton's resignation or termination, although the Agreement restricts Anderton from disclosing Plaintiff's trade secrets for the life of the information (Id. at ¶ 2c).

6.   Additionally, for one year following his resignation or termination, the Agreement prohibits Anderton from interfering with Plaintiff's contractual relationships with any "customer or vendor of the Company" (Id. at ¶ 1a(ii)).  The agreement also states that Anderton will not "[d]irectly or indirectly solicit, advise or encourage or attempt to solicit, advise or encourage any

---

[4] He did sign Plaintiff's Employee Manual when he started work in May 2004, thereby agreeing to maintain the confidentiality of information related to Plaintiff's business (Pl. Ex. 4, 5).  The manual states that no employee is permitted to remove or make copies of any of Carolina Door's reports or documents without management approval (Pl. Ex. 5 at 1).

[5] This court, sitting in diversity, applies Florida's choice of law rules.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Florida courts enforce choice of law provisions in non-compete agreements.  See, e.g., Rollins, Inc. v. Parker, 755 So. 2d 839, 841 (Fla. Dist. Ct. App. 2000); Punzi v. Shaker Adver. Agency, Inc., 601 So. 2d 599, 600 (Fla. Dist. Ct. App. 1992).

(i) customer or vendor of the Company to terminate, reduce or modify its relationship with the Company in a manner which is adverse to the Company . . ." (Id. at ¶ 1b). Paragraphs 1a and 1b do not have geographic restrictions.

7. The Agreement further prohibits Anderton from providing services to or being employed by a "Competing Business in the Territory" for one year following his resignation or termination (Id. at ¶ 1c).[6] The Agreement defines "Territory" in six different ways, with each definition progressively narrower than the one before it (Id.).[7]

8. Concerning Carolina Door's remedies in the event of Anderton's breach, the Agreement states:

> a. the company shall be irreparably injured in the event of a breach or threatened breach by Employee of any of Employee's obligations under this Agreement;
>
> b. monetary damages shall not be an adequate remedy for any such breach or threatened breach;
>
> c. the Company shall be entitled to specific performance or injunctive relief without proof of special damages, in addition to any other remedy which it may have, in the event of any such breach or threatened breach . . .

(Id. at ¶ 6a-c).

---

[6] The Agreement defines this term as a business "engaged in the sale, installation, repair and maintenance of manual or automatic doors and related products." (Pl. Ex. 2 at ¶ 1c).

[7] The first definition of "Territory" is the most expansive: it includes the area within a "100-mile radius of Employee's territory of the West Coast of Florida, namely the following counties: Citrus, Hernando, Pasco, Pinellas, Hillsborough, Manatee, Sarasota, DeSoto, Charlotte, Glades, Lee, Hendry and Collier . . ." (Pl. Ex. 2 at ¶ 1c). Under the Agreement, if a court determines the first definition to be too broad, "the parties agree the Territory shall be reduced" systematically (as specified in definitions two through six) "until the court determines an acceptable geographic area . . ." (Id.) If the court determines that all of the definitions of "Territory" contained in the Agreement are too broad, "then the parties agree that the court may reduce or limit the area to enable the intent of this Section to be enforced in the largest, legally acceptable geographic area." (Id.)

9.  In mid-January 2007, after giving Plaintiff two weeks' notice via an e-mail dated January 2, 2007, Anderton resigned from his position as branch manager (Pl. Ex. 3).  In the e-mail, Anderton stated that he planned to start his own motor control gear business with his wife (Id.).

10.  After resigning from Carolina Door, however, Anderton accepted a job as a salesman with Orange State and began work almost immediately.  In fact, Anderton had been in negotiations with Orange State since mid-November 2006.  Orange State is Plaintiff's direct competitor and distributes and services automatic and manual door equipment in western and central Florida, a territory that includes almost all of the counties in which Carolina Door's Tampa branch operates. Some of Carolina Door's customers are prior customers of Orange State's, including the University of South Florida ("USF") and Ashe Glass.

11.  Richard Giese ("Giese") hired Anderton because of his knowledge of the industry in the expectation that Anderton would expand Orange State's customer base, even if this meant soliciting Carolina Door's existing customers.

12.  Once Carolina Door learned of Anderton's employment with Orange State, Jim Engelerdt ("Engelerdt") reviewed Anderton's former e-mail account with Carolina Door and discovered that on one occasion in October 2005, more than a year before he resigned, Anderton sent a customer list for the Tampa branch to his home e-mail account (Pl. Ex. 10).  The customer list includes customer names, addresses, and volume of sales for the past two years.  According to the document, some of the customers listed had not done business with Carolina Door for at least two years (Id.).  Anderton could not recall why he sent this e-mail to his home account.

13. Since working for Orange State, Anderton has directly solicited some of Carolina Door's customers, including USF, Radiant Oil, Ashe Glass, Harmon Glass, and Shawmut Construction (see

6

Dkt. 2 at 8).  Anderton submitted a price quotation to Shawmut Construction, and he recently obtained the business of Radiant Oil, a prior customer of Carolina Door's that Anderton knew had complained about Carolina Door's billing practices.  Anderton also convinced USF, a Carolina Door customer who had hired Orange State in the past, to retain Orange State.

## III.    Preliminary Injunction Standard

As a threshold matter, although this is a diversity case involving the interpretation of a contract under North Carolina law, federal law applies in determining whether a preliminary injunction should issue.  See Ferrero v. Assoc. Materials Inc., 923 F.2d 1441, 1448 (11th Cir. 1991) (applying Fed. R. Civ. P. 65 standards to request for preliminary injunction involving the enforcement of a non-compete agreement interpreted under Georgia law); Interbake Foods, L.L.C. v. Tomasiello, 461 F. Supp. 2d 943, 955 (N.D. Iowa 2006) (internal citations omitted) (applying federal rather than Iowa law to a request for a preliminary injunction because "federal courts are to apply their own rules of civil procedure, including Rule 65, which incorporates traditional federal equity practice for the issuance of preliminary injunctions").

The district court has the sound discretion to grant or deny a request for preliminary injunction.  Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002) (internal citations omitted).  In order for the court to issue a preliminary injunction, the moving party must show: (1) a substantial likelihood of success on the merits; (2) that the moving party will suffer irreparable injury if the injunction is not issued; (3) that the threatened injury to the moving party outweighs the potential damage that the proposed injunction may cause the non-moving party; and (4) that the injunction will not be adverse to the public interest.  Fed. R. Civ. P. 65; General Motors Corp. v. Phat Car Carts, Inc., No. 8:06-CV-900-T-24MSS, 2006 WL 2982869, at * 3 (M.D. Fla. Oct. 18, 2006)

(internal citations omitted).  An injunction is an extraordinary remedy which should not be issued "unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites."  Glen Raven Mills, Inc. v. Ramada Int'l, Inc., 852 F. Supp. 1544, 1547 (M.D. Fla. 1994) (internal citations omitted).

## IV.    Conclusions of Law

### A.    Breach of Contract Claim Against Anderton

The court has the power to grant an injunction to enforce the terms of a valid non-compete agreement.  See, e.g., N. Am. Products Corp. v. Moore, 196 F. Supp. 2d 1217, 1228 (M.D. Fla. 2002); Wine Not, Int'l v. 2atec, LLC, No. 8:06-CV-117-T-23, 2006 WL 1766508, at * 9 (M.D. Fla. June 26, 2006).  Plaintiff alleges that Anderton has breached the Agreement by working for Orange State because Orange State and Carolina Door are direct competitors, Anderton is soliciting Carolina Door's customers, and Anderton is divulging Carolina Door's confidential information to Orange State.   Notably, Anderton and Orange State admit that Anderton has solicited Carolina Door's customers and that Orange State is a direct competitor in the same regional market as Carolina Door.  Anderson also concedes that he had access to Carolina Door's confidential information when he was branch manager but disputes that he has shared this information with Orange State.

Rather than contesting breach, Anderton and Orange State argue that the Agreement is unenforceable under North Carolina law because it was not supported by consideration and is overbroad.

### 1.    Likelihood of Success on the Merits

Under North Carolina law, a covenant not to compete is valid and enforceable if it is:  (1) in writing; (2) made a part of the employment contract; (3) based on valuable consideration; (4)

8

reasonable as to terms, time, and territory; and (5) not against public policy.  Precision Walls, Inc.
v. Servie, 568 S.E.2d 267, 272 (N.C. App. 2002) (citing Triangle Leasing Co. v. McMahon, 393 S.E.
2d 854, 857 (N.C. 1990)).  Here, the first two criteria are not in dispute.

Anderton received adequate consideration for executing the Agreement.  Under North
Carolina law, a covenant entered into after an employment relationship already exists must be
supported by new consideration, such as a raise in pay or new job assignment.  Reynolds &
Reynolds Co. v. Tart, 955 F. Supp. 547, 553 (W.D.N.C. 1997) (internal citation omitted).  Continued
employment in the same territory and on the same terms cannot provide consideration for the
employee's promise.  Id. (internal citation omitted).

The Agreement and the letter of understanding offered additional tangible benefits to
Anderton, namely a guarantee of a $75,000 minimum salary for 2005, a $4,000 bonus payable to
Anderton on January 6, 2006, and $100.[8]  Despite Anderton's argument that he had the ability to
earn $75,000 per year prior to signing the Agreement through a combination of salary, commissions,
and bonuses, his salary at Carolina Door when he resigned was fixed at $52,000.  Additionally, the
one-year salary guarantee, the $4,000 bonus, and the $100 were directly linked to Anderton's
signing of the Agreement.  For these reasons, the Agreement was supported by adequate
consideration.

The next issue is whether the time and geographic limits outlined in the Agreement are
reasonable.  The covenant not to compete in this case bars Anderton from employment with a direct

_____

[8]  Defendants are correct that the $100 Anderton received upon signing the Agreement is
insufficient consideration, standing alone, to support the covenant not to compete.  See Reynolds,
955 F. Supp. at 553 n.6.  Because he also agreed to additional benefits, however, Anderton received
adequate consideration.

competitor of Carolina Door for a one-year period following his resignation or termination. This one-year period is well within the established parameters for covenants not to compete. See, e.g., Farr Assoc., Inc. v. Baskin, 530 S.E.2d 878, 881 (N.C. 2000) (noting that a five-year restriction in a non-compete agreement is "outer boundary which our courts have considered reasonable . . ."); Precision Walls, Inc., 568 S.E.2d at 273 (N.C. App. 2002) (upholding a one-year restriction in a covenant not to compete); QSP, Inc. v. Hair, 566 S.E.2d 851, 853 (N.C. App. 2002) (same). Of particular significance is the fact that Anderson's managerial position gave him the opportunity to acquire intimate knowledge of Plaintiff's business and develop relationships with Plaintiff's customers. See Manpower of Guilford County, Inc. v. Hedgecock, 257 S.E.2d 109, 114 (N.C. App. 1979).

The scope of the Agreement's geographic restriction is also valid. A geographic limitation in a non-compete agreement must not be any broader than is necessary to protect the employer's reasonable business interests. See Okuma Am. Corp. v. Bowers, 638 S.E.2d 617, 620 (N.C. App. 2007) (internal citations omitted). Thus, to show reasonableness of a geographic restriction, "an employer must first show where its customers are located and that the geographic scope of the covenant is necessary to maintain those customer relationships." Id. (internal citation and quotation marks omitted). In this case, the Agreement prohibits Anderton from working for a competitor of Carolina Door's within a 100-mile radius of his sales territory. Engelerdt testified that Carolina Door's Tampa branch had customers in each of the counties listed in the Agreement, and Giese testified that Orange State does business in a majority of these counties as well. Therefore, the geographic restriction contained in the Agreement is reasonably tailored to protect the established relationship between Carolina Door and its customers.

10

Anderton and Orange State also argue that the Agreement is unreasonable because it restricts Anderton from working in the industry in any capacity within the geographic region.  As an example, Anderton and Orange State assert that the Agreement bars Anderton from working as a cashier for Lowe's or Home Depot because these businesses sell *manual* doors and door hardware.  However, Anderton would be just as likely to disclose Carolina Door's confidential and proprietary information if he worked for a competitor in a different position.[9]  See Precision Walls, Inc., 568 S.E.2d at 273.  Further, Anderton is not prohibited from working in the industry completely.  Rather, the Agreement bars him from only working for a competitor.  Thus, Plaintiff's legitimate business interests support the Agreement's prohibition on Anderton's employment of any kind with a competitor. Id. (upholding restriction that prohibited employee from working in the industry in any capacity because, if permitted to work for a competitor, the employee would feel pressure to divulge confidential information if asked); but see Visionair, Inc. v. James, 606 S.E.2d 359, 362-63 (N.C. App. 2004) (striking similar restriction in light of non-compete agreement's time and geographic limitations of two years and an entire region of the country).  In light of the relatively short duration of the time restriction and the narrow scope of the geographic limitation, the term in the Agreement restricting Anderton from working in any position for a competitor in the same geographic region is reasonable.[10]

---

[9]  Additionally, the Agreement defines a competitor as a business engaged in the "sale, installation, repair, *and* maintenance" of automatic and manual doors (Pl. Ex. 2 at ¶ 1c) (emphasis added).  This definition is narrow enough to satisfy North Carolina law regarding non-compete agreements.  Moreover, the court is not aware that Lowe's and Home Depot provide all of these services to its customers and Defendants did not produce evidence to this effect.

[10]  Defendants also assert that the Agreement is unreasonable because ¶¶ 1a and 1b do not contain geographic restrictions.  These paragraphs prohibit Anderton from directly or indirectly soliciting Plaintiff's customers, among other things (Plf. Ex. 2 at ¶¶ 1a-b).  The case on which Defendants rely

As stated above, the Agreement is tailored to protect Carolina Door's business interests.  See Okuma, 638 S.E.2d at 621-22.  The Agreement exists to safeguard Plaintiff's relationships with its customers and its confidential information.  Id. at 621 (a non-compete is designed to protect a legitimate business interest "if the nature of the employment is such as will bring the employee in personal contact with patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers") (internal citation and quotation marks omitted).  Therefore, the Agreement meets the final criteria for enforceability in that it is not against public policy.

Also, Anderton has likely breached the Agreement by working for Orange State and soliciting Carolina Door's customers.  Plaintiff has also established a likelihood that Anderton has divulged Plaintiff's confidential information by making a price quote to at least three of Plaintiff's customers (USF, Shawmut Construction, and Radiant Oil) in violation of the Agreement's provisions regarding proprietary information.  Having established that the Agreement is enforceable under North Carolina law, Plaintiff has thus demonstrated its likelihood of success on the merits of its breach of contract claim.

        2.    <u>Irreparable Harm</u>

Carolina Door has also demonstrated that it will suffer irreparable injury due to Anderton's continued employment with Orange State.

Carolina Door argues that it will be irreparably harmed by the loss of valuable customer

---

for this argument, Hedgecock, 257 S.E.2d at 115, is distinguishable.  In Hedgecock, the court held that a geographic restriction prohibiting a former employee from engaging in a similar business within a 25-mile radius of a Manpower office anywhere in the country was unreasonable because Manpower was not a party to the case and the plaintiff (a Manpower franchise) only had offices in three North Carolina cities.  Id.

relationships and customer goodwill.  Pure economic injury, such as lost sales, profits, or market share, does not constitute irreparable harm.  <u>Southtech Orthopedics, Inc. v. Dingus</u>, 428 F. Supp. 2d 410, 418 (E.D.N.C. 2006).  However, the possibility of permanent loss of customers to a competitor and the loss of goodwill can constitute irreparable harm "where the damages are intangible and thus impossible to ascertain."  <u>Id.</u> (internal citation omitted); <u>Ferrero</u>, 923 F.2d at 1449.  In cases where a defendant's conduct threatens to cripple or substantially alter a business concern, irreparable harm exists.  <u>Southtech</u>, 428 F.Supp.2d at 418 (internal citations omitted).

Here, Carolina Door has established irreparable injury.  First, the parties stipulated in the Agreement that Anderton's breach or threatened breach would irreparably harm Carolina Door and entitle Carolina Door to injunctive relief (Plf. Ex. 2 at ¶ 6a-c).  <u>See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.</u>, 356 F.3d 1256, 1266 (10th Cir. 2004) (giving weight to stipulation in contract as to irreparable harm while noting that the stipulation "without more is insufficient to support an irreparable harm finding"); <u>Outcomes Pharm. Health Care, L.C. v. Nat'l Community Pharmacists Ass'n</u>, No. 4:05-cv-00682-JEG, 2006 WL 3782905, at * 12-* 13 (W.D. Iowa Dec. 22, 2006) (same).

Additionally, Carolina Door's regional sales manager testified that Anderton's conduct in soliciting Carolina Door's customers could result in a substantial loss to Carolina Door's business. Engelerdt anticipated that Carolina Door may even close its Tampa branch if Anderton continues to lure away its customers through underbidding.  Anderton has admitted to soliciting Carolina Door's customers; in less than two months since he began working for Orange State, he has obtained the business of Radiant Oil.

Anderton, on the other hand, contends that any losses sustained by the Tampa branch are

small when compared to the size of the company.  This is unpersuasive.  See Ferrero, 923 F.2d at 1449 (disregarding the argument that in the irreparable injury analysis the court should compare the losses sustained to the size of the company).

Defendants also maintain that a tolling provision in the Agreement precludes a finding of irreparable harm.  Paragraph 6e of the Agreement provides that the restrictive covenants shall be tolled during the period of time that a court determines Anderton is in breach (Plf. Ex. 2 at ¶ 6e). The case on which Defendants rely for this argument, Southtech, 428 F.Supp.2d at 417-18, interprets a tolling provision as one factor militating against irreparable harm.[11]  Here, Carolina Door has introduced substantial evidence that as an Orange State employee, Anderton has utilized the professional relationships he forged with Carolina Door's customers to acquire their business. Further, his job description with Orange State requires him to continue doing this.  This conduct, according to Engelerdt, may force the closure of Carolina Door's Tampa office.

The risk in this case is immediate: Anderton has been working at Orange State for less than two months and already has acquired at least one of Carolina Door's customers who had not previously done business with Orange State.  The loss of Plaintiff's customer goodwill and relationships cannot be adequately recompensed with monetary damages.  Moreover, Carolina Door anticipated that Anderton's breach would substantially impact its business interests and the parties included a stipulation regarding irreparable harm in the Agreement.  For these reasons, an injunction in this case is the only adequate remedy.

3.      Balance of Hardships

---

[11]  Also, the discussion of tolling provisions in Southtech was offered to rebut the plaintiff's argument that irreparable harm is presumed from the breach of a covenant not to compete.  428 F. Supp. 2d at 417.

The balance of hardships weighs in Carolina Door's favor as well. Anderton will lose his job with Orange State for one year if a preliminary injunction issues. He testified that he will be forced to move due to his lack of income. However, he has worked as a salesman in the electronics industry for most of his professional life; as a salesman he has a set of skills he can transfer to numerous sales positions anywhere in the country. Also, there is no evidence that Orange State will suffer any significant hardships if the court issues a preliminary injunction.

Plaintiff, on the other hand, faces the risk of losing its confidential information and its customer goodwill, invaluable assets in the service industry in which it operates. The court finds that the harm that will inure to Anderton if the court grants the injunction would not outweigh the irreparable harm to Plaintiff if the injunction were not granted.

4.      Public Interest

Finally, the court must examine whether "granting [a] preliminary injunction will disserve the public interest. E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1530 n.13 (11th Cir. 1985). Here, the court finds that a preliminary injunction enforcing the terms of the Agreement is not adverse to the public's interest; conversely, a preliminary injunction would affirmatively serve the public interest by upholding a valid non-compete provision. Burger King Corp. v. Lee, 766 F. Supp. 1149, 1157 (S.D. Fla. 1991) ("It is not in the public interest to condone [Defendants'] material breach of the Agreement . . .").

B.      Trade Secrets Act Claim Against Anderton and Orange State

Count Three of Plaintiff's Complaint asserts in a very general fashion that Anderton and Orange State have misappropriated its trade secrets in violation of Florida and North Carolina law (Dkt. 1 at 13). Plaintiff's motion for a preliminary injunction, however, does not specifically request

15

relief under this theory and instead focuses on Anderton breach of the Agreement. Nevertheless, the court will analyze whether an injunction is appropriate as to Plaintiff's Count Three.

        1.      Substantial Likelihood of Success

Plaintiff has established a likelihood of success on its claim that Anderton is misappropriating its trade secrets by utilizing Plaintiff's confidential pricing information and customer list to solicit Plaintiff's customers.

The elements of a misappropriation of trade secrets claim are: (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy; and (2) the secret plaintiff possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it. Border Collie Rescue, Inc. v. Ryan, 418 F. Supp. 2d 1330, 1338 (M.D. Fla. 2006).[12]

Defendants argue that the information Plaintiff seeks to protect does not constitute trade secrets because Defendants can obtain the information through trade publications, telephone directories, and public records requests. Although the court recognizes that it is possible to obtain at least some of this information from public sources, Anderton obtained his particular knowledge of Plaintiff's customers and its pricing methods through his employment at Carolina Door. Anderton had access to customer lists for the Tampa branch (including customers' names, addresses, and volume for sales to each customer), Plaintiff's pricing information, information regarding the profits and losses of the Tampa branch, and service request forms. He cannot now feign ignorance of this information.

---

[12] North Carolina has adopted the Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152, et seq., which is substantially similar.

Having established that the information at issue contains trade secrets, the court finds that Plaintiff likewise took reasonable steps to protect this information.  First, Plaintiff restricted access to this information to managers.  It distributed an employee manual that contained a confidentiality clause, which Anderton signed, and it fashioned a non-compete to protect its confidential information from disclosure in the event of an employee's termination or resignation.  Anderton's appreciation of the sensitivity of this information is clear because he felt the need to mislead Carolina Door in his resignation letter into thinking he was starting a motor control gear business, when in fact, he had already contacted Wiese multiple times about working for Orange State.  This misrepresentation to Carolina Door is one factor the court considers in determining that Anderton's testimony that he did not make use of Plaintiff's confidential information is unconvincing.  Finally, Anderton concedes that he had access to Plaintiff's confidential information.

As to misappropriation, Plaintiff produced evidence that Anderton has submitted price quotes to Plaintiff's customers in violation of the Agreement and that Anderton has utilized Plaintiff's pricing information in at least one instance, in making a bid to USF.  Plaintiff also has produced evidence that Anderton obtained the business of Radiant Oil through his inside knowledge of the company's dissatisfaction with Plaintiff's billing practices.  And as Wiese indicated that it is Anderton's job to expand Orange State's customer base, the threat of continued misappropriation is real.

Thus, the undersigned finds that Plaintiff will have probable success in showing that Anderton has misappropriated its trade secrets.

Regarding Plaintiff's trade secrets act claim against Orange State, Plaintiff has also established that it is substantially likely to succeed because Orange State had reason to know that

the information Anderton was using to court Plaintiff's customers was acquired through improper means.  Although there is no direct evidence that Orange State acquired Carolina Door's trade secrets, Orange State should have known that Anderton was utilizing Plaintiff's trade secrets in soliciting customers and placing bids.  Moreover, Wiese testified that although he was not aware of the Agreement when he hired Anderton, in hindsight he was not surprised to learn of the non-compete.  Therefore, Plaintiff has established a likelihood of success on this claim.  See East v. Aqua Gaming, Inc., 805 So.2d 932 (Fla. Dist. Ct. App. 2001) (granting injunction against competitor and former employee working for competitor for misappropriation of trade secrets).

### 2.    Irreparable Harm

For the reasons stated in the irreparable harm analysis concerning Plaintiff's breach of contract claim, Plaintiff can establish irreparable harm as to Anderton's and Orange State's threatened misappropriation of trade secrets in the future because this conduct may lead to the permanent loss of customer goodwill.  However, with respect to customers improperly obtained by Orange State, any harm Plaintiff suffered can be remedied through monetary damages in the form of lost profits.  Therefore, only the threat of disclosure or misappropriation of Plaintiff's trade secrets by Anderton and Orange State in the future constitutes irreparable injury sufficient to justify injunctive relief as to Count Three.  See Pac. Aerospace & Elec., Inc. v. Taylor, 295 F. Supp. 2d 1188, 1204 (E.D. Wa. 2003) (granting injunction prohibiting future trade secret misappropriation due to the "relative ease of proving monetary damages from defendants' disgorged profits").

### 3.    Balance of Hardships

The balance of hardships weighs in favor of Plaintiff.  Plaintiff's customer base is a valuable asset.  If Defendants continue to utilize Plaintiff's trade secrets, they will erode this customer base

and undermine Plaintiff's legitimate business interest in maintaining customer relationships. Importantly, Orange State produced no evidence as to the hardship it will suffer if a preliminary injunction issues.  And, as stated above, the fact that Anderton will lose his job and be forced to relocate is not enough to tip the scales in his favor.

4.      Public Interest

The public interest will not be harmed by the issuance of an injunction prohibiting Defendants' future misappropriation of Carolina Door's trade secrets.

Thus, Plaintiff has satisfied all of the prerequisites to injunctive relief as to its misappropriation of trade secrets claim against Anderton.  On balance, the court finds that injunctive relief against Orange State is appropriate as well.

## V.      Security Requirement

Federal Rule of Civil Procedure 65(c) states that "no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  In the event that the court grants injunctive relief as recommended, the court will have to determine that appropriate amount of bond.  At the hearing, Plaintiff suggested a bond between $5,000 and $75,000 (the amount of Anderton's salary at the time of his resignation).  Defendants suggested a $1.2 to $1.3 million bond to reflect the amount of business generated by Carolina Door's Tampa branch in 2004 and 2005.

Upon consideration of the circumstances, including the strength of Plaintiff's case, the undersigned recommends a bond in the amount of $100,000 as reasonable.  Anderton has the skills

19

to work in another industry and an injunction would not prohibit him from working in other areas outside of his former sales territory.  That amount will also afford a measure of protection to Orange State.

## VI.    Conclusion

Upon consideration, the undersigned **RECOMMENDS** that:

(1)    Plaintiff's **Emergency Motion for Preliminary Injunction and Incorporated Memorandum of Law** (Dkt. 2) be **GRANTED in part** and a preliminary injunction be **ISSUED** as follows:

A.    for a period of one year following the date any injunction issues, prohibiting Defendant Anderton from working for Orange State or any other person or company engaged in the sale, installation, repair, and maintenance of manual or automatic doors and related products in the following Florida counties: Citrus, Hernando, Pasco, Pinellas, Hillsborough, Manatee, Sarasota, DeSoto, Charlotte, Glades, Lee, Hendry, and Collier;

B.    prohibiting Defendants Anderton and Orange State from divulging any of Plaintiff's trade secrets or confidential information learned during Anderton's employment with Plaintiff, specifically information pertaining to Plaintiff's pricing methods, customer lists, and profits and losses;

C.    requiring Defendants Anderton and Orange State to immediately return to Plaintiff any of Plaintiff's trade secrets or confidential information in their possession, specifically information pertaining to Plaintiff's pricing methods, customer lists, and profits and losses;

20

D.   for a period of one year following the date any injunction issues, prohibiting Defendant Anderton from soliciting, either directly or indirectly, any of Plaintiff's customers, vendors, or employees;

E.   for a period of one year following the date any injunction issues, prohibiting Orange State from soliciting, either directly or indirectly, any of Plaintiff's customers who were not also customers of Orange State's prior to March 8, 2007; and

F.   requiring Plaintiff to post a $100,000 bond.  <u>See</u> Fed. R. Civ. P. 65(c).

(2)   Plaintiff's **Motion for Expedited Discovery** (Dkt. 10) be **DENIED as moot**.

Dated: March 8, 2007.

_____
ELIZABETH A JENKINS
United States Magistrate Judge

<u>NOTICE TO PARTIES</u>

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal.  See 28 U.S.C. 636 (b)(1).